# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re | Case No. 10-00243 |
| | Chapter 13 |
| WALDO IKAIKA AHIA and ROCHELLE ANTOINETTE AHIA, | |
| Debtors. | |
| | |
| WARLITO A. T. QUERUBIN, | Adv. Pro. No. 10-90070 |
| Plaintiff, | |
| vs. | |
| WALDO IKAIKA AHIA and ROCHELLE ANTOINETTE AHIA, | Re: Docket No. 1 |
| Defendants. | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

The trial in this adversary proceeding was held on May 23-25, 27, and 31,

2011. Preston A. Gima represented plaintiff Warlito A.T. Querubin ("Warlito"),[2]

---

[1]The court has not selected this decision for publication.

[2]I will refer to the participants by their first names to avoid confusion, and without intending any disrespect.

U.S. Bankruptcy Court - Hawaii   #10-90070   Dkt # 36   Filed 06/28/11   Page 1 of 21

and Alex M. Sonson represented defendants Waldo Ikaika Ahia ("Waldo") and Rochelle Antoinette Ahia ("Rochelle"). Based on the evidence, the court makes the following

## FINDINGS OF FACT:

### *The Participants*

1.     Warlito is the father of seven children. Waldo is one of Warlito's children. Rochelle is Waldo's wife and Warlito's daughter in law.

2.     Warlito's parents are both deceased. His mother, who survived his father, died on October 31, 2006.

3.     Warlito has two living siblings, Claire Somera and Esperanza Onaga.

4.     Warlito is married to Jane Querubin. For many years, he has lived with Sharleen Ferreira, not with his wife.

5.     Warlito is sixty eight years old. He suffered a stroke on June 13, 2006. The stroke affected his mobility and made it very difficult for him to speak and be understood, but did not seriously affect his ability to think. At all relevant times, he understood his situation and was able to make rational decisions. His memory is reasonably good, especially for a man of his age who has survived a stroke. He is not financially sophisticated.

2

6.     Warlito and his wife Jane own a home in Ewa. Jane lives in the Ewa house.

7.     Warlito and his sister Esperanza inherited from their parents a home in Waipahu.

8.     Warlito's only income consists of social security benefits and a small pension from his former employer, totaling about $1,400 per month.

9.     Other than the assets and income described above, Warlito did not (from 2006 to the present) have any substantial financial resources.

*The Power of Attorney and the Trust Agreement*

10.    On June 14, 2006, while Warlito was in the hospital recovering from his stroke, Warlito signed a power of attorney which appointed Waldo as his attorney in fact. Warlito signed the power of attorney because he trusted Waldo to take care of him and his property. (Warlito later revoked the power of attorney.)

11.    On July 12, 2006, after Warlito was discharged from the hospital, Warlito signed a document which created a trust. The trust agreement provides that Warlito was the trustee and the sole beneficiary during Warlito's life. The trust property consisted of one dollar plus Warlito's interests in the Ewa and Waipahu properties. The agreement states that Waldo, Rochelle, and their

3

children would be the beneficiaries of the trust after Warlito's death. Warlito retained the power to revoke or amend the trust and to withdraw property from the trust. Warlito signed the trust agreement because he trusted Waldo to take care of him during Warlito's life and because, at that time, he wanted Waldo to have his interests in the Waipahu and Ewa properties upon his death (but not before). (Warlito later revoked the trust.)

12. The trust agreement was ineptly drawn. For example, it lists only Waldo, Rochelle, and their children as members of Warlito's family, omitting his other six children and grandchildren. The provision for the appointment of a successor trustee is baffling. The trust was never properly implemented because Warlito never conveyed the real properties to it. (He could not have transferred the Waipahu property to the trust when the trust was formed. Warlito's mother, from whom Warlito and Esperanza inherited the Waipahu property, did not die until October 31, 2006, and Warlito did not obtain title to the Waipahu property from his mother's trust until February or March 2007.)

13. Rochelle and Laura Lee Riley, the notary who acknowledged Warlito's signature, testified that Leslie Togioka, an attorney, prepared the power of attorney and trust agreement. I do not believe this testimony. No competent attorney would have (a) prepared a power of attorney or a trust agreement without

4

at least speaking to the person making those documents, (b) prepared a document that was as defective as the trust agreement, or (c) failed to prepare the deeds necessary to transfer the real property to the trust.

14. The power of attorney and trust agreement are relevant to this case primarily because they show that, when Warlito signed them, he trusted Waldo to take care of him and his affairs and he intended that Waldo, Rochelle, and their children would get his interest in the Waipahu property upon his death. They are also relevant because Rochelle's testimony that an attorney drafted them was not truthful.

<em>The Sale of the Waipahu Property</em>

15. Soon after Warlito and Esperanza inherited the Waipahu property, they decided that one of them should buy the other's share of that property. Warlito could not afford to buy Esperanza's share. Claire or Esperanza talked to Waldo and Rochelle about buying Esperanza's share, but Waldo and Rochelle did not do so.

16. On July 6, 2007, Esperanza and Warlito agreed that Esperanza would buy Warlito's share of the Waipahu property for $275,000.

17. Esperanza paid Warlito $10,000 on or about July 6, 2007, and the balance of $265,000 on July 28, 2007. Esperanza and Warlito's other sister,

5

Claire, were concerned about Warlito's financial situation. Warlito had incurred credit card and other debts that he could not afford. Accordingly, with Warlito's participation and agreement, they used about $36,000 of the sale proceeds to pay off his medical bills, auto loan, and credit cards. They also closed the credit card accounts. Out of the rest of the proceeds, Warlito gave his wife, Jane, $10,000, deposited $19,000 in a joint checking account in the names of Warlito and Sharleen, and deposited $200,000 in three bank accounts. The first account was a certificate of deposit, in the amount of $100,000, issued by American Savings Bank in the names of Warlito and Claire as joint tenants. The second account was a savings account at Bank of Hawaii in the names of Warlito and Claire as joint tenants, in which they deposited $50,000. The third account was a savings account at Territorial Savings Bank in the names of Warlito and Sharleen as joint tenants, in which they deposited $50,000.

18.    Claire's interest in the American Savings Bank and Bank of Hawaii accounts was solely that of a trustee for Warlito's benefit. Claire was listed as a joint owner of the two accounts so that she could help take care of her brother Warlito's money after his stroke. Warlito and Claire did not intend that Claire could use any of the money for her own purposes.

19.    Sharleen's interest in the Territorial Savings Bank account was solely

6

that of a trustee for Warlito's benefit. Although Sharleen was a joint holder of the Territorial Savings Bank account, she expressly agreed, in writing, that the money in the account belonged to Warlito, would be used only for his benefit and not for her personal use, and would be given to his descendants.

*The Events of September 12, 2007*

20.     Warlito, Claire, Esperanza, and Sharleen did not tell any other members of Warlito's family about Esperanza's purchase of Warlito's interest in the Waipahu property.

21.     Waldo learned of the sale of the Waipahu property in September 2007. He was upset because he believed that Warlito had promised the property to him and because his father had not talked to him about the sale even though he held his father's power of attorney.

22.     On September 11, 2007, Waldo and Rochelle met Warlito at Warlito and Sharleen's home. Waldo told Warlito that he was upset about the sale of the Waipahu property. He also told Warlito that he was upset that Claire was a joint holder of two of the bank accounts. He told Warlito that Claire would steal Warlito's money. During the meeting, Warlito and Waldo asked Warlito's eldest son, Daniel, to join them. They explained the situation to Daniel and showed him some papers concerning the sale. Daniel told Warlito to leave the money as is, and

7

that Claire would not steal his money. This made Waldo even more upset. He left Warlito's home in anger, saying he wanted nothing more to do with the power of attorney or his father's affairs.

23. The next day, September 12, 2007, is the most important day in the history of this case. What happened that day is largely undisputed. Warlito's intentions on that day, however, are hotly contested.

24. On September 12, 2007, Warlito, Sharleen, Waldo, and Rochelle met at American Savings Bank and Bank of Hawaii. Waldo withdrew all of his funds on deposit with those institutions. After paying an early withdrawal penalty at American Savings Bank, he received $149,581.23. He deposited those funds in a new certificate of deposit at American Savings Bank. The named holder of the certificate was Waldo, as trustee, and Waldo's two children, as beneficiaries. The certificate was due to mature on March 12, 2008.

25. On the same day, Warlito, Sharleen, Waldo, and Rochelle went to Territorial Savings Bank. Warlito made Waldo an additional holder of his account at that bank.

### *Waldo's Use of the Money*

26. On October 24, 2007, Waldo withdrew $12,000 from the account at Territorial Savings Bank that he held jointly with Sharleen. Warlito approved this

8

withdrawal and intended it to be an outright gift to Waldo.

27.     Beginning on January 29, 2008, Waldo withdrew all of the money on deposit with American Savings Bank. Waldo spent all of the proceeds to pay bills and expenses for himself, Rochelle, and their children, and none of it for Waldo's benefit. Warlito did not authorize these withdrawals and did not learn about them until later.

28.     On July 9, 2008, Waldo withdrew $1,500 from the Territorial Savings Bank account. Waldo and Rochelle testified that Warlito authorized them to withdraw this money in order to reimburse them for the legal fees for preparation of the power of attorney and the trust agreement which they had paid almost two years before. I find that this testimony is false. Warlito did not authorize this withdrawal. Moreover, the trust agreement and power of attorney were not drafted by an attorney, so there were no attorneys' fees to reimburse.

### *Warlito's Intentions on September 12, 2007*

29.     Waldo claims that Warlito intended to make an outright gift to Waldo on September 12, 2007. Warlito claims that he did not intend to give Waldo his money outright, but rather intended to have Waldo replace Claire as a trustee of his money for his (Warlito's) benefit.

30.     I find that Warlito did not intend to make an outright gift to Waldo on

9

September 12, 2007. He intended that Waldo would replace Claire as a trustee of the funds for his benefit, and did not intend to give Waldo the right to use the money during Warlito's lifetime for Waldo's personal purposes. I make this finding for the following reasons (among others):

a. Warlito testified emphatically that he never intended to give the money outright to Waldo. Sharleen corroborated Warlito's testimony in important respects. Waldo and Rochelle testified to the contrary, but I find Warlito's and Sharleen's testimony more credible.

b. It made no sense for Warlito to give virtually all of his money to Waldo while Warlito was still alive because, apart from that money, Warlito had only a minimal income on which to live and no safety net for medical bills or unexpected expenses.

c. Similarly, there was no reason for Warlito to give all of the money to Waldo, leaving nothing for Warlito's other six children and their descendants. This became important when, during 2008, two of Warlito's other sons, Daniel and Malcolm, became ill and died, and Warlito had no money with which to help them and their families.

d. Warlito repeatedly asked Waldo, and had Claire and other family members ask Waldo, to return the money. He would not have done this if

10

he had intended to give Waldo the money outright.

   e. Waldo admitted that he was obligated to return the money. After Waldo's brother, Daniel, fell ill in April 2009, Daniel told Waldo that Waldo needed to make things right with their dad (by which he meant, and Waldo understood that he meant, that Waldo should return the money to Warlito). Waldo said that he would make it right. A few weeks later, while Daniel was undergoing treatment in Texas, Daniel made the same request and Waldo repeated his assurance that he would make it right. On July 3, 2009, after Daniel died, the family met and discussed (among other things) the money that Warlito had transferred to Waldo. Several family members demanded that Waldo return the money to Warlito. Waldo confronted his father angrily, demanding that Warlito "tell the truth" about what had happened. Warlito said that he wanted his money back. Waldo again said that he would make it right and would call family members during the following week to discuss the matter further. He never returned any of the money.

   f. When Waldo withdrew the money in January 2008, he was having serious financial trouble. In August 2006, Waldo started a new job as a stevedore, earning about $100,000 per year. At about the same time, Rochelle began working as a mortgage solicitor, earning commissions of $50,000 to

$60,000 per year. The new jobs enabled Waldo and Rochelle to improve their standard of living and buy a house in April 2007. Their mortgage payment was about $4,500 per month, but their incomes were sufficient to cover this. In the fall of 2007, the United States fell into a financial crisis. The mortgage lending business was particularly hard hit. During or shortly before January 2008, Rochelle lost her job. This reduced Waldo's family income by about a third and left them unable to pay their mortgage and their other living expenses. Waldo took Warlito's money in an attempt to keep afloat. His contention that Warlito gave him the money in September 2007 is a recent fabrication.

31. The strongest piece of evidence supporting Waldo's contention is the fact that the new accounts opened on September 12, 2007, were explicitly established in the name of Waldo as trustee for his children. The account documents contain no indication that Waldo retained any interest in the accounts. Waldo and Rochelle testified that the bank officers questioned Warlito carefully to make sure that he understood and intended those transactions. This evidence is outweighed by the contrary evidence that Warlito did not intend to give the money to Waldo outright. Warlito probably did not fully understand all of the implications of the documents creating the accounts.

32. Waldo gave his father $1,000, but has not returned any other part of

U.S. Bankruptcy Court - Hawaii   #10-90070   Dkt # 36   Filed 06/28/11   Page 12 of 21

the money transferred on September 12, 2007.

*The Credit Cards*

33.     As noted above, when Esperanza paid Warlito for his share of the Waipahu property in July 2007, Warlito intended to pay off all of his credit card debts and closed the credit card accounts.  Warlito and Sharleen forgot, however, that they had another credit card issued by Chase (account no. xxxx xxxx xxxx 2902), of which Warlito was the primary and Sharleen the secondary user. Sharleen remembered that card in August 2007.  She used the proceeds of the property to pay off the debt.  She did not, however, close the account.

34.     At a later date (probably some time in September 2007), Waldo was added as an authorized user of the first Chase card.

35.     In September 2007, Chase issued another card (account no. xxxx xxxx xxxx 6867) under which Warlito was the primary user and Waldo and Rochelle were authorized users.

36.     In January 2008, at about the same time as Rochelle lost her job, Waldo and Rochelle began to use the Chase cards.  They charged at least $33,016.28.  All of the goods and services they bought with the cards were for their personal purposes.  None of the purchased items benefitted Warlito.  Warlito did not know about these charges when Waldo and Rochelle made them.

13

37.     Waldo and Rochelle made some payments on the Chase cards but eventually fell into default.  Chase demanded payment from Warlito, as the primary holder of the account.  Warlito told Chase that he did not make the charges and did not authorize anyone else to make them.  Chase then contacted Waldo and accused him of fraudulently using the cards.  Waldo signed a promissory note in favor of Chase, in which he promised to pay $19,815.18 plus interest.  In the note, Waldo "acknowledge[d] that the principal amount of this Note represents amounts charged by [Waldo] to [the Chase cards], which the Bank issued to a party other than [Waldo] and which [Waldo] had no authority to use . . . ." [Emphasis added.]

38.     Waldo and Rochelle testified that Warlito knowingly added them as authorized users by telephoning Chase, telling Chase what he wanted to do, and then handing the phone to Rochelle so she could provide the required information.  Warlito testified that he did not authorize Waldo and Rochelle to use the credit cards and did not know how they became authorized users.  Warlito's counsel argued that Waldo and Rochelle must have convinced Chase to add them to the charge accounts by using the power of attorney which Warlito had signed.  For the following reasons, I find Warlito's position more plausible:

      a.     Warlito's speech is severely impaired as a result of his stroke.

14

It was difficult to understand him when he was speaking in court; it would be even more difficult to understand him on the telephone. Someone listening to him speak for a short time on the telephone would likely doubt his competence. Therefore, it is not likely that a credit card company would have accepted Warlito's oral telephonic authorization to add Waldo and Rochelle to his accounts.

        b.    Waldo and Rochelle's testimony makes no sense. Their theory of the case is that Warlito gave them the lion's share of his money, leaving him with few assets and a much smaller income than Waldo and Rochelle (even after Rochelle lost her job). Waldo and Rochelle do not explain why Warlito would have also let them borrow more money for which Warlito was liable and which Warlito had no means to repay.

        c.    As noted above, Waldo admitted in writing that he had no authority to use the accounts.

    39.    Because Waldo and Rochelle became authorized users of the cards based on the power of attorney, and because the power of attorney imposed upon them a fiduciary duty to act in Warlito's best interest, not in their own personal interests, Waldo and Rochelle had no authority to use the credit cards for their own personal purposes.

    Based on the foregoing findings of fact, the court makes the following

## CONCLUSIONS OF LAW:

1.     The court has jurisdiction over this adversary proceeding, which is a core proceeding in bankruptcy.  28 U.S.C. § 157(b)(2)(I) (2006).  Venue is proper.

2.     Warlito contends that its claims against Waldo and Rochelle are not dischargeable under sections 523(a)(2) and (a)(4) of the Bankruptcy Code.

3.     Exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor.  Snoke v. Riso (In re Riso), 978 F.2d 1151, 1154 (9th Cir. 1992); see also National Union Fire Insurance Co. of Pittsburgh v. Bonnanzio (In re Bonnanzio), 91 F.3d 296, 300 (2d Cir. 1996); Meyer v. Rigdon, 36 F.3d 1375, 1385 (7th Cir. 1994).

4.     The plaintiff seeking to establish an exception to the discharge bears the burden of proof.  Fed. R. Bankr. P. 4005; see also In re Niles, 106 F.3d 1456, 1464-65 (9th Cir. 1997).  The plaintiff must meet this burden by a preponderance of the evidence.   Grogan v. Garner, 498 U.S. 279, 286 (1991); Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman), 234 F.3d 1081, 1085 (9th Cir. 2000).

5.     A plaintiff can rely on inferences to carry its burden of proof.  In re Malget, 165 B.R. 933 (Bankr. S.D. Cal. 1994).  An inference is permissible if it is "drawn by reason from the facts on which it purports to rest."  Dreijer v. Girod

16

Motor Company, 294 F.2d 549, 554 (5th Cir. 1961).

*Section 523(a)(2)*

6.      Section 523(a)(2)(A) of the Bankruptcy Code  provides:

A discharge under . . . this title does not discharge an individual
debtor from any debt -

* * *

> (2)    for money, property, services, or an extension, renewal
> or refinancing of credit, to the extent obtained by -
>
> > (A)    false pretenses, a false representation, or actual
> > fraud, other than a statement respecting the
> > debtor's or an insider's financial condition . . .

11 U.S.C. § 523(a) (2009); see also Cohen v. de la Cruz, 523 U.S. 213, 218-22

(1998).  To prevail on a claim under § 523(a)(2)(A), a creditor must demonstrate

five elements:

> (1)    misrepresentation, fraudulent omission or deceptive conduct by
> the debtor;

> (2)    knowledge of the falsity or deceptiveness of his statement or
> conduct;

> (3)    an intent to deceive;

> (4)    justifiable reliance by the creditor on the debtor's statement or
> conduct; and

> (5)    damage to the creditor proximately caused by its reliance on
> the debtor's statement or conduct.

17

In re Weinberg, 410 B.R. 19, 35 (B.A.P. 9th Cir. 2009); In re Slyman, 234 F.3d at 1085; Am. Express Travel Related Servs. Co. v. Hashemi (In re Hashemi), 104 F.3d 1122, 1125 (9th Cir. 1996).

7.    Warlito claims that he transferred the money to Waldo based on Waldo's promise to take care of him. In order for this to amount to "fraud," Warlito must also prove that Waldo never intended to keep that promise. In re Rubin, 875 F.2d 755, 759 (9th Cir. 1989) ("[A] promise made with a positive intent not to perform or without a present intent to perform satisfies § 523(a)(2)(A)."). The evidence that Waldo explicitly promised to take care of Warlito is weak, and there is no evidence that Waldo did not intend to keep any promise he made at the time he made it.

## *Section 523(a)(4)*

8.    Section 523(a)(4) prevents discharge "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).

9.    "Defalcation" as used in section 523(a)(4) means a misappropriation of trust funds or money held in any fiduciary capacity, or the failure to account properly for such funds. In re Hemmeter, 242 F.3d 1186, 1190 (9th Cir. 2001); In re Lewis, 97 F.3d 1182 (9th Cir. 1996); In re Baird, 114 B.R. 198 (B.A.P. 9th Cir. 1990). "[T]he essence of defalcation in the context of § 524(a)(4) is a failure to

18

produce funds entrusted to a fiduciary." Id. Intent to defraud is not required; defalcation includes innocent as well as intentional failures. Id.; see also F.D.I.C. v. Jackson, 133 F.3d 694 (9th Cir. 1998) ("[D]efalcation, at least for the purposes of nondischargeability under Section 523(a)(4), includes any behavior by a fiduciary, including innocent, negligent and intentional defaults of fiduciary duty . . . .")

10. Federal law defines the phrase "fiduciary capacity" as used in section 523(a)(4). Lewis v. Scott (In re Lewis), 97 F.3d 1182, 1185 (9th Cir. 1996). The term "fiduciary" as used in section 523(a)(4) has a narrow meaning. Only relationships arising from express or technical trusts qualify as fiduciary relationships under section 523(a)(4). Id.

> The meaning of 'fiduciary capacity' under section 523(a)(4) is a question of federal law, which has consistently limited this term to express or technical trust relationships. The broad general definition of a fiduciary relationship--one involving confidence, trust and good faith--is inapplicable in the dischargeability context. The debt alleged to be nondischargeable must arise from a breach of trust obligations imposed by law, separate and distinct from any breach of contract. In addition, the requisite trust relationship must exist prior to and without reference to the act of wrongdoing. This requirement eliminates constructive, resulting or implied trusts.

In re Baird, 114 B.R. at 198. While the definition of "fiduciary capacity" under section 523(a)(4) is governed by federal law, courts must look to state law to determine whether the requisite trust relationship exists. In re Cantrell, 260 B.R.

U.S. Bankruptcy Court - Hawaii   #10-90070   Dkt # 36   Filed 06/28/11   Page 19 of 21

413, 421 (B.A.P. 9th Cir. 2001); see also Ragsdale v. Haller (In re Haller), 780 F.2d 794, 795 (9th Cir. 1986).

11.     An inter vivos trust may be oral unless otherwise required by a statute of frauds. Restatement (Third) of Trusts § 20 (2003); Ishida v. Naumu, 34 Haw. 363, 1937 WL 4469, at *2 (1937) (noting that an express trust may be made by written or spoken words or by conduct). When Warlito deposited funds in the certificate of deposit at American Savings Bank in Waldo's name, he created an express oral trust with the understanding that Waldo was to use the money for the benefit of Warlito until his death.

12.     Waldo's interest in the money transferred by Warlito on September 12, 2007, was that of a "fiduciary" within the meaning of section 523(a)(4). Waldo's use of the money for his personal purposes, rather than for Warlito's benefit, amounted to "defalcation" within the meaning of that section.

13.     Waldo and Rochelle used the power of attorney to persuade Chase to make them authorized users of the Chase cards. Waldo and Rochelle owed a fiduciary duty to use the power of attorney only in Warlito's best interests, not in their own personal interests. Kunewa v. Joshua, 83 Haw. 65, 72 (Haw. App. 1996). Waldo and Rochelle's use of the Chase cards for their own personal purposes constitutes defalcation in a fiduciary capacity.

U.S. Bankruptcy Court - Hawaii   #10-90070   Dkt # 36   Filed 06/28/11   Page 20 of 21

14.     There remains the question of the proper remedy for the use of the credit cards.  The record does not indicate whether Chase is pursuing Warlito for Waldo and Rochelle's charges.  It would be unjust to require Waldo and Rochelle to reimburse Warlito for a debt that he may not have to pay.  The correct remedy is to require Waldo and Rochelle to protect Warlito in the event that Chase takes collection action against him.

15.     Warlito is entitled to a judgment against Waldo and Rochelle, jointly and severally, in the amount of $149,581.23 (the amount withdrawn from the American Savings Bank account on September 12, 2007) plus $1,500.00 (the amount withdrawn to reimburse Waldo and Rochelle for the spurious "attorneys' fees"), requiring Waldo and Rochelle to indemnify, defend, and hold Warlito harmless from any and all liability or loss on account of the Chase cards, and declaring that all such obligations are not dischargeable in bankruptcy.

/s/ *Robert J. Faris*
**United States Bankruptcy Judge**
Dated: **06/28/2011**

21